**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS CAMPOS and JENNIE CORONA-CANTU, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LANDRY'S INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

THE PARTIES........................................................................................................... 3

JURISDICTION AND VENUE .................................................................................. 3

FRAUDULENT CONCEALMEANT AND TOLLING............................................... 4

SUBSTANTIVE ALLEGATIONS ............................................................................ 5

    A.    Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ............................................. 5

    B.    Defendant Falsely Informed Users That They Could Reject the Websites' Use of Cookies. ................................................................... 10

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites. ............................................. 36

        1.    Facebook Cookies. ..................................................................... 36

        2.    Google Cookies. ......................................................................... 53

        3.    Additional Third-Party Cookies.............................................. 81

    D.    The Third Parties Intercept User Communications While in Transit. ................ 87

    E.    The Signaling and Addressing Information Intercepted by the Third Parties....................................................................... 90

    F.    The Private Communications Collected are Valuable. ....................................... 92

PLAINTIFFS' EXPERIENCES .............................................................................. 93

CLASS ALLEGATIONS ........................................................................................ 99

CAUSES OF ACTION .......................................................................................... 101

    First Cause of Action: Invasion of Privacy..................................................... 101

    Second Cause of Action: Intrusion Upon Seclusion....................................... 104

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ...................................................... 106

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .............................. 109

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation........... 111

    Sixth Cause of Action: Unjust Enrichment................................................... 114

PRAYER FOR RELIEF ........................................................................................ 116

CLASS ACTION COMPLAINT

Plaintiffs Carlos Campos and Jennie Corona-Cantu ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Landry's Inc. ("Defendant" or "Landry's"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their respective personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendant's websites, bubbagump.com (the "Bubba Gump Website"), chart-house.com, delfriscos.com, delfriscosgrille.com, horatios.com, joescrabshack.com (the "Joe's Crab Shack Website"), kincaids.com, mastrosrestaurants.com (the "Mastro's Website"), mccormickandschmicks.com (the "McCormick Website"), mortons.com (the "Morton's Website"), peohes.com, rainforestcafe.com, rustypelican.com, and skatesonthebay.com (each separately a "Website" and collectively, the "Websites"), Defendant displays to them a popup cookie consent banner, which is substantially similar on each of the Websites. Defendant's cookie banners disclose that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that, rather than accepting cookies, they can instead opt out of cookies by clicking a "Do Not Sell My Personal Information" link, as shown in the following example screenshot from the Bubba Gump Website, which has been vertically stretched to enhance readability:

2.      Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

CLASS ACTION COMPLAINT

3.      Even after users elect to adjust the toggle switch to reject all cookies, except those "First Party Strictly Necessary Cookies" required for the Websites to function, and the "Sale of Personal Data", Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics and DoubleClick), and others (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Websites.

4.      Contrary to users' express rejection of cookies and tracking technologies on the Websites, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding the Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what the Websites' visitors sought to avoid when they adjusted the toggle switch on the Websites' Manage Consent Preferences window to reject all non-strictly necessary cookies (including Performance and Targeting cookies) and the "Sale of Personal Data. Defendant falsely told their Websites' users that it respected user privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant

CLASS ACTION COMPLAINT

ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated users of the Websites.

### THE PARTIES

7.    Plaintiff Carlos Campos is, and was at all relevant times, an individual and resident of Crockett, California. Plaintiff Campos intends to remain in California and makes [her] permanent home

8.    Plaintiff Jennie Corona-Cantu is, and was at all relevant times, an individual and resident of Montebello, California. Plaintiff Corona-Cantu intends to remain in California and makes her permanent home there.

9.    Defendant Landry's Inc. is a Delaware corporation with its headquarters and principal place of business in Houston, Texas. Defendant owns, operates, manages, and/or controls numerous restaurant brands and affiliated Websites, including through subsidiary and affiliated entities.[1]

### JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.    Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

---

[1] Recent SEC filings list no fewer than 90 subsidiary entities associated with Defendant, or one of its closely controlled affiliates. *See* https://www.sec.gov/Archives/edgar/data/908652/000119312511068593/dex21.htm.

CLASS ACTION COMPLAINT

substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**FRAUDULENT CONCEALMEANT AND TOLLING**

15. The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting all non-strictly necessary cookies (including Performance and Targeting cookies) on the Websites, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their visits to the Websites because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experiences on the Websites would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Websites honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16. On or about November 11, 2025, Defendant was notified by Plaintiffs' counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of all non-strictly necessary cookies (including Performance and Targeting cookies) and the selling of user information. Despite this notice, Defendant did not disclose this conduct to users.

17. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could "Reject All" non-strictly necessary cookies, including Performance and Targeting cookies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the November 11, 2025 demand letter describing

- 4 -

substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

18.    Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on one of the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website's server to identify the origin of the request and return the response.

19.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

20.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Websites were located in California.

21.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party

- 5 -

resources on the Websites is done so pursuant to agreements between Defendant and those Third Parties.

22. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

23. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the server or servers associated with each of the Websites). First-party cookies are used to track users when they repeatedly visit the same website.

24. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, www.google.com, adentifi.com, etc.). When the user's browser loads a webpage (such as a webpage of one of the Websites) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

25. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect users' personal information from the Websites, such as their browsing activities and private communications with Defendant, including the following:

CLASS ACTION COMPLAINT

- **Browsing History**: Information about the webpages a user visits on the Websites, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Websites;

- **Website Interactions:** Data on which links, buttons, or ads on the Websites that a user clicks;

- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with the Websites' content;

- **Interests and Preferences**: Insights into user interests based on the types of content viewed, products searched for, or topics engaged with on the Websites;

- **Shopping Behavior**: Information about the products viewed or added to shopping carts on the Websites;

- **Device Information**: Details about the Websites' users' devices, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Websites;

- **Session Information**: Details about the user's current browsing session on the Websites, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific user across different websites over time; and/or

- **Geolocation Data**: General location information based on a user's IP address or GPS data, if accessible, including whether a user is located in California.

- 7 -

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

26.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

27.     Defendant owns, operates, and manages numerous restaurant brands and dining establishments throughout the United States, including Bubba Gump Shrimp Company, Mastro's Restaurants, Morton's The Steakhouse, McCormick & Schmick's, and Joe's Crab Shack, and other restaurant concepts. Defendant also owns and operates the Websites, which allow visitors to obtain information about Defendant's restaurant brands, menu offerings, restaurant locations, reservations, promotions, and related merchandise, including gift cards. As users interact with the Websites—including by entering information into forms, searching for restaurant locations, making reservations, selecting menu or dining options, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

28.     Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Websites, or that Defendant causes

- 8 -
CLASS ACTION COMPLAINT

to be loaded. Because Defendant controls the Websites' software code, and is capable of determining whether a user is accessing the Websites from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

29.    Defendant explained the third-party cookies it used on the Websites as follows in its Privacy Policy:

> Cookies and Tracking Technology. When you access the website, we (and third-party companies we work with) may collect and store certain information by using technologies such as server logs, cookies, web beacons, clear gifs, tags, e-tags, flash cookies, log files, pixels, code, JavaScript packages, mobile advertising IDs (such as Facebook cookies or Google's Advertising ID), cross-device linking, and similar technologies. The information collected includes information about your activities on our Sites, IP address, browser or operating system type and version, device IDs, and demographic or inferred-interest information, as well as information or communications you have submitted to us through the Sites.
>
> We use this information to understand general usage and volume statistics, how users navigate to and around our Sites, what content is viewed or accessed, and which products and services have been obtained. We also use these technologies to keep track of your preferences and profile information. We also use these technologies to allow third parties to provide analytics and advertising services and serve advertisements on our behalf across the Internet and in mobile applications. For example, our advertising partners may use the fact that you visited our Site to target advertising to you on other websites and mobile apps on your current device or on other devices you use. They may match your browsers or devices if you log into the same online service on multiple devices. These third parties' partners may use this information for our and their own advertising, analytics, attribution, and reporting purposes. To learn more about interest-based advertising, tracking technologies, and how to opt out, please visit http://www.aboutads.info/choices. You can disable the sharing of your personal information for cross-contextual behavioral advertising or targeted advertising through online tracking technology by clicking on the cookie icon on the bottom left side of our homepage and selecting "Required Only" or toggling the Share of Sale of Personal Data toggle to the left to change it from green to gray.[2]

30.    Defendant further explained the types of cookies it used on the Websites as follows in its "Manage Consent Preferences" window (which, like the popup cookie consent banner, was also substantially similar on each of the Websites where it was used):

> **Strictly Necessary Cookies — Always Active**
>
> These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you

---

[2] Landry's Privacy Policy (updated 7/9/2025) (available at https://www.landrysinc.com/privacy-notice) (the "Privacy Policy").

CLASS ACTION COMPLAINT

which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. These cookies do not store any personally identifiable information.

**Performance Cookies**

These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

**Targeting Cookies**

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

**B.    Defendant Falsely Informed Users That They Could Reject the Websites' Use of Cookies.**

31.    When Plaintiffs and other consumers in California visited, for example, the Bubba Gump Website, the Website immediately displayed to them a popup cookie consent banner (which was substantially similar to the banner on each of the Websites, in that it purported to give users the option to reject the Websites' use of cookies). As shown in the screenshot below, the cookie consent banner stated, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." The banner then purported to provide users the opportunity, rather than choosing to "Accept Cookies," to instead click or select the "Do Not Sell My Personal Information" link, as shown in the following screenshot (which is stretched vertically to enhance readability) from the Bubba Gump Website:[3]

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners.

---

[3] As alleged throughout this Complaint, each of the Websites function the same way in using or placing unwanted cookies, even after users have expressly rejected all such cookies, including the sale of their personal information. The Bubba Gump Website is one of Defendant's many Websites, and, although the workflow described in this section is specific to the Bubba Gump Website, all of Defendant's Websites purport to allow users to reject non-strictly necessary cookies, yet continue to use and place unwanted cookies as users browse the Websites.

CLASS ACTION COMPLAINT

32.    Plaintiffs and other users of the Bubba Gump Website who clicked or selected the "Do Not Sell My Personal Information" link were then directed to Defendant's "Manage Consent Preferences" window (which, like the popup cookie consent banner, was also substantially similar on each of the Websites where it was used). There, Defendant further represented to its Bubba Gump Website's users the following:

> When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different category headings to find out more and change our default settings according to your preference. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.)…

33.    Defendant also represented that Bubba Gump Website users could opt-out of "Sale of Personal Data" and the cookies associated with such sales or sharing of personal data, including Performance and Targeting cookies, by adjusting the available toggle switch to do so, as shown in the following example screenshots from the Bubba Gump Website:



CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

34. Users who adjusted the toggle switch, then selected or clicked the "Confirm My Choices" button—thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Bubba Gump Website, including Performance and Targeting cookies, except those "First Party Strictly Necessary Cookies" the Website needed to function—could then continue to browse the Website, as the popup cookie consent banner and "Manage Consent Preferences" window both disappeared.

35. Defendant's popup cookie consent banner and "Manage Consent Preferences" window led Plaintiffs, and all those users of the Bubba Gump Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies (other than those "First Party Strictly Necessary Cookies" the Website needed to function), but specifically including those Performance and Targeting cookies used to "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data. The banners and "Manage Consent Preferences" windows further reasonably led Plaintiffs and those users of the Bubba Gump Website similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting the available toggle switch to reject all such cookies, and the sale or sharing of all such personal information.

36. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other users of the Bubba Gump Website elected to "Do Not Sell My Personal Information" and adjusted the "Sale of Personal Data" toggle switch, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

CLASS ACTION COMPLAINT

37. Nevertheless, even after receiving that notice, Defendant caused the Third Parties' tracking cookies to be placed on users' browsers and devices and/or transmitted to the Third Parties along with user data.

38. In particular, when users adjusted the "Sale of Personal Data" toggle switch, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses visitors' Private Communications with the Bubba Gump Website, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

39. In addition to the Bubba Gump Website, each of Defendant's Websites likewise displayed substantially similar popup banners and (on some Websites) cookie preferences windows to the Websites' users, where Defendant made similar representations to its users, and each of which purported to give users the option to reject cookies other than those which are strictly necessary for each Website to function, or to otherwise opt-out of the sale and sharing of user personal information. And, like the Bubba Gump Website, the other Websites caused consumers' devices to transmit cookie data and other data to a similar number of third parties— even after consumers reject all such cookies,

40. Some aspects of the operations of the Third Parties' cookies on the Websites can be observed using specialized tools that log incoming and outgoing network transmissions with the Websites. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties even after the user, for example, adjusted the "Sale of Personal Data" toggle switch on the "Manage Consent Preferences" window on the Bubba Gump Website, or otherwise exercised the available options on the Websites to reject all such cookies.

- 15 -
CLASS ACTION COMPLAINT

a.   On the Bubba Gump Website:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

- 19 -
CLASS ACTION COMPLAINT

b.    On the Joe's Crab Shack Website:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

c.     On the Mastro's Website:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

d.     On the McCormick Website:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

e.     On the Morton's Website:



CLASS ACTION COMPLAINT

| Name | Domain | Type | Cookies ▼ | Size | T |
|------|--------|------|-----------|------|---|
| trigger/?id=675807732625549&ev... | www.facebook.com | png | 6 | 0.2 kB | 1. |
| tr/?id=675807732625549&ev=Pag... | www.facebook.com | text/pl... | 6 | 0.0 kB | 8 |
| trigger/?id=675807732625549&ev... | www.facebook.com | png | 6 | 0.2 kB | 1. |
| tr/?id=675807732625549&ev=Pag... | www.facebook.com | text/pl... | 6 | 0.0 kB | 8 |
| trigger/?id=675807732625549&ev... | www.facebook.com | png | 6 | 0.2 kB | 1. |
| tr/?id=675807732625549&ev=Pag... | www.facebook.com | text/pl... | 6 | 0.0 kB | 8 |
| anchor?ar=1&k=6LcM_jgpAAAAALj... | www.google.com | docu... | 5 | 43.1 kB | 4 |
| anchor?ar=1&k=6LcM_jgpAAAAALj... | www.google.com | docu... | 5 | 43.2 kB | 4 |
| 978507385/?random=1748380883... | www.google.com | gif | 5 | 0.6 kB | 3 |
| collect?en=page_view&dr=www.m... | www.google.com | ping | 5 | 0.0 kB | 1. |
| 978507385/?random=1748380878... | www.google.com | gif | 5 | 0.5 kB | 1. |
| collect?v=2&tid=G-KGPQM8K9DK... | analytics.google.com | fetch | 5 | 0.0 kB | 1. |
| collect?en=page_view&dr=www.m... | www.google.com | fetch | 5 | 0.3 kB | 1. |
| collect?v=2&tid=G-KGPQM8K9DK... | analytics.google.com | fetch | 5 | 0.0 kB | 1. |
| 978507385/?random=1748380870... | www.google.com | gif | 5 | 0.5 kB | 1. |
| collect?en=page_view&dr=www.m... | www.google.com | ping | 5 | 0.0 kB | 2 |
| anchor?ar=1&k=6LcM_jgpAAAAALj... | www.google.com | docu... | 5 | 42.8 kB | 4 |
| 525081333?title=0&byline=0&port... | player.vimeo.com | docu... | 2 | 9.8 kB | 5. |
| 525081333?title=0&byline=0&port... | player.vimeo.com | docu... | 2 | 9.9 kB | 4 |
| collect?v=1&_v=j101&a=44938157... | www.google-analytics.com | xhr | 1 | 0.0 kB | 1. |
| collect?v=1&_v=j101&a=15634849... | www.google-analytics.com | xhr | 1 | 0.0 kB | 1. |
| collect?v=1&_v=j101&a=19314358... | www.google-analytics.com | xhr | 1 | 0.0 kB | 9 |
| sw_iframe.html?origin=https%3A%... | www.googletagmanager.com | docu... | 0 | (disk cache) | 1. |
| 978507385?random=1748380878... | td.doubleclick.net | docu... | 0 | 0.0 kB | 1. |
| 978507385?random=1748380870... | td.doubleclick.net | docu... | 0 | 0.0 kB | 2 |
| webworker.js?hl=en&v=jt8Oh2-U... | www.google.com | script | 0 | 0.0 kB | 5. |
| cookieStorage.html | wsv3cdn.audioeye.com | docu... | 0 | (disk cache) | 1. |
| webworker.js?hl=en&v=jt8Oh2-U... | www.google.com | script | 0 | 0.0 kB | 6 |
| 978507385?random=1748380883... | td.doubleclick.net | docu... | 0 | 0.0 kB | 1. |
| webworker.js?hl=en&v=jt8Oh2-U... | www.google.com | script | 0 | 0.0 kB | 1. |
| sw_iframe.html?origin=https%3A%... | www.googletagmanager.com | docu... | 0 | (disk cache) | 1. |
| 1087244143-c81d599ee6ec28e86... | i.vimeocdn.com | avif | 0 | 52.3 kB | 4 |
| player.css | f.vimeocdn.com | styles... | 0 | (disk cache) | 4 |
| segment.m4s?pathsig=8c953e4f~... | vod-adaptive-ak.vimeocdn.com | xhr | 0 | 819 kB | 1. |
| segment.m4s?pathsig=8c953e4f~... | vod-adaptive-ak.vimeocdn.com | xhr | 0 | 1,858 kB | 1. |
| segment.m4s?pathsig=8c953e4f~... | vod-adaptive-ak.vimeocdn.com | xhr | 0 | 2,269 kB | 2. |
| vendor.module.js | f.vimeocdn.com | script | 0 | (disk cache) | 2. |
| segment.m4s?pathsig=8c953e4f~... | vod-adaptive-ak.vimeocdn.com | xhr | 0 | 1,538 kB | 3 |
| segment.m4s?pathsig=8c953e4f~... | vod-adaptive-ak.vimeocdn.com | xhr | 0 | 209 kB | 3 |

376 / 385 requests     18,431 kB / 18,559 kB transferred     55,696 kB / 56,320 kB resources     Finish: 18.51 s     DOMContentLoaded: 13.63 s

CLASS ACTION COMPLAINT

41.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with five of Defendant's many

CLASS ACTION COMPLAINT

Websites at https://www.bubbagump.com, https://www.joescrabshack.com/, https://www.mastrosrestaurants.com/, https://www.mccormickandschmicks.com/, and https://www.mortons.com/, respectively. The screenshots depict only network traffic occurring *after* the user rejected all non-strictly necessary cookies using the cookie banner, "Manage Consent Preferences" window or other options available on each of the Websites. As shown above, despite the user's rejection of all such cookies, the user's interactions with the Websites resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, www.google.com, adentifi.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies (including Performance and Targeting cookies) by adjusting the available toggle switch to do so, or by using the similar options available on Defendant's other Websites. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies, except those strictly necessary for the Websites to function.

42.     Plaintiffs' and other Websites' users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

43.     As users interact with the Websites, even after adjusting the available toggle switch in the "Manage Consent Preferences" window (or by using the similar options available on Defendant's other Websites)—thereby declining or rejecting the use of cookies and similar technologies used to "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data, or other purposes—more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to

be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

44.    The Third Party code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Websites' users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites.[4]**

**1.    Facebook Cookies.**

45.    Defendant also causes third-party cookies to be transmitted to and from users' browsers and devices on the Websites, to and from the **facebook.com** domain, even after users elect to reject all cookies, other than those strictly necessary for the Websites to function. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user

---

[4] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all cookies on Defendant's Websites (other than those strictly necessary for the Websites to function).

CLASS ACTION COMPLAINT

retargeting, and analytics.[5] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

46.     Facebook's cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Bubba Gump Website cause the following data—including cookie data—to be sent to Meta when the user visits the Website's menu page:

[5] https://www.facebook.com/privacy/policies/cookies/.

- 37 -

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

47.    The "ev" parameter is short for "event." In this instance, the event is a "PageView."

48.    The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, the menu page for the Bubba Gump restaurant in Anaheim, California.

49.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

50.    The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

51.    The "fr" cookie is a marketing cookie, and is used "to provide ad delivery or retargeting."[6]

52.    The "referer" header further discloses to Facebook that the user was visiting the Bubba Gump Website when the data was sent.

53.    The "user-agent" header enables Facebook to determine the user's device, operating system, and browser.

[6] *See* https://cookiedatabase.org/cookie/facebook/fr/.

CLASS ACTION COMPLAINT

54.     In addition, each and every network transmission from the user's browser includes the user's IP address—enabling Facebook to determine the user's geolocation and also to identify the user and/or the user's device—as well as Facebook's IP address.

55.     The browsers of users who had logged in to Facebook at some point prior to visiting any of the Websites would have additionally sent a "c_user" cookie to Facebook. That cookie enables Facebook to identify a specific user when they are logged in to their account. The "c_user "cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

56.     The other Websites cause substantially similar data—including cookie data—to be sent to Facebook after users reject cookies. For example, below is the type of data—including cookie data—that is sent to Facebook after the user rejects cookies on the Joe's Crab Shack Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

- 40 -

- 41 -

- 42 -



57.     Below is the type of data that is sent to Facebook after the user rejects cookies on the Mastro's Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

- 44 -

- 45 -



58.     Below is an example of the data—including cookie data—that is sent to Facebook after the user rejects cookies on the McCormick Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

- 47 -

CLASS ACTION COMPLAINT



59.      Below is an example of the data—including cookie data—that is sent to Facebook after the user rejects cookies on the Morton's Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

60.     By identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[7] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[8]

61.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses) —including whether a user is located in California.[9]

62.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the

_____

[7] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[8] https://allaboutcookies.org/what-data-does-facebook-collect.
[9] *Id.*

CLASS ACTION COMPLAINT

facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

**2.    Google Cookies.**

63.    Defendant causes third-party cookies to be transmitted to and from Websites' users' browsers and devices, even after users reject all cookies, other than those strictly necessary for the Websites to function, to and from the **www.google.com**, **analytics.google.com**, and **www.google-analytics.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[10] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[11] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[12]

---

[10] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[11] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[12] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

CLASS ACTION COMPLAINT

64.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[13] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

65.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[14] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[15]

66.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[16]

---

[13] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[14] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[15] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).
[16] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How

CLASS ACTION COMPLAINT

67.    For example, the Google software code that Defendants cause to be stored on and executed by the user's device causes the following data—including cookie data—to be sent to Google's domain, at analytics.google.com, after the user rejects cookies on the Bubba Gump Website:

---

Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=63867067566957562-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

- 55 -
CLASS ACTION COMPLAINT

| | |
|---|---|
| npa | 0 |
| pae | 1 |
| pscdl | noapi |
| ptag_exp | 101509157~103116026~103130498~103130500~103200004~103233427~103252644~103252646~103290358~104481633~104481635 |
| sct | 1 |
| seg | 1 |
| sid | 1748312107 |
| sr | 1920x1080 |
| tag_exp | 101509157~102015666~103116026~103130498~103130500~103200004~103233427~103252644~103252646~104481633~104481635 |
| tfd | 5302 |
| tid | G-H4T8SD10CT |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;136.0.7103.114|Google%20Chrome;136.0.7103.114|Not.A%2FBrand;99.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

CLASS ACTION COMPLAINT

- 57 -

CLASS ACTION COMPLAINT

68.     The "en" parameter discloses to Google that the user was viewing a page. The "dl" parameter refers to "Document Location." It discloses to Google the URL that the user was visiting. Here, the url is https://www.bubbagump.com/. The "dt" parameter refers to "Document Title." Here, the user was visiting a page with the title "Bubba Gump Shrimp Co. | Seafood Restaurant."

69.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[17]

_____

[17] *See, e.g.,* https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

CLASS ACTION COMPLAINT

70.    The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

71.    The "NID" cookie is used for Google advertising. According to Google documentation, "[t]he 'NID' cookie is used to show Google ads in Google services for signed-out users," and "expires 6 months after a user's last use."[18]

72.    The "referer" header further discloses to Google that the user was visiting the Bubba Gump Website when the data was sent.

73.    The "__Secure-3PAPISID" and "__Secure-3PSID" cookies used on the Website are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting.

74.    The "user-agent" header enables Google to determine the user's device, operating system, and browser.

75.    In addition, each and every network transmission from the user's browser includes the user's IP address—enabling Google to determine the user's geolocation and also to identify the user and/or the user's device—as well as Google's IP address.

76.    The other Websites cause substantially similar data—including cookie data—to be sent to Google after users reject cookies. For example, below is the type of data that is sent to Google after the user rejects cookies on the Joe's Crabshack Website:

---

[18] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| sct | 1 |
|---|---|
| seg | 1 |
| sid | 1748318019 |
| sr | 1920x1080 |
| tag_exp | 101509157~103116026~103130495~103130497~103200004~103233427~103252644~103252646~104481633~104481635 |
| tfd | 342 |
| tid | G-39EK350L59 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;136.0.7103.114|Google%20Chrome;136.0.7103.114|Not.A%2FBrand;99.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

CLASS ACTION COMPLAINT

- 63 -

CLASS ACTION COMPLAINT

| content-length | 0 |
|---|---|
| cookie | \_\_Secure-3PSID=g.a000xQiz-rahOehKPPAagg9aEMfE-8j6db_f3bIASpQUeFib_9nucLvQ0pUAnIbKKTXrLAr_RwACgYKAboSARYSFQHGX2Mi0fwTmOTp_3Hr1XANoHnISBoVAUF8yKo4jm45c4UWfobp-p7C9RhO0076; \_\_Secure-3PAPISID=IW78Kr2rH9_BX2sN/AQRPgaOGX02m07WCk; NID=524=PW9udIg6pY7WpnMb7vvVvepLbfqStJj5Ii06xLo5h_697Om3-87O_yiKUixzqrjN4UOO88Y-KIISfEWyTw0HrcskU2fjDGaC9w4kAAgBqZa2Os5HOXVfd55qIPSaeL1JF96E-v2xElocbNVNxmAzC5hfu9IyobJgIrYwTbHok5bux4CfCaiXITM4HPUelisb56Q62MYE0dalv8Gu1JaF4Nsuzo7yxcDPAhzgBWz-dbkZYYhLk3xPkZLwO6TMICt1To8Yk5xORnMirR0aRxMhpPA3C6mDFphkaVBcSRkx0kSwTxvx8CHinp97YNd6cBzMf-eT1-aMbFhsZEN1cniGO73S3iB1ITq-mnmijvoXj1WX2ISSXSg; \_\_Secure-3PSIDTS=sidts-CjEB5H03P-9J1tiBmMLZT2nFzIDGeqXXCa0XM25eQAKEsmQcJvo8WkO-OIUTBDLcNzAMEAA; \_\_Secure-3PSIDCC=AKEyXzW3WQjj_6H29AT5NVpoXeb-ul06-Ok44Wrlep8intpa2VGPZWVEpOYvc_Prm0I0J9x0f5Y |
| dnt | 1 |
| origin | https://www.joescrabshack.com |
| priority | u=1, i |
| referer | https://www.joescrabshack.com/ |
| sec-ch-ua | "Chromium";v="136", "Google Chrome";v="136", "Not.A/Brand";v="99" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/537.36 |
| x-client-data | CJe2yQEIo7bJAQipncoBCPvsygEIlKHLAQiSo8sBClagzQEI3e7OAQ== |
| Host | analytics.google.com |

CLASS ACTION COMPLAINT

POST
204

https://analytics.google.com/g/collect?v=2&tid=G-39
95~103130497~103200004~103233427~103252644~10325264
35&cid=1711028395.1748318019&ul=en-us&sr=1920x1080&
v=13.5.1&uaw=0&are=1&pae=1&frm=0&pscdl=noapi&_eu=AA
ww.joescrabshack.com%2Fstore-locator%2F&dt=Sacramen

Request  Header  Query  Body  **Cookies**  Raw | Summary  +

| Key | Value |
| --- | --- |
| __Secure-3PSID | g.a000xQiz-rahOehKPPAagg9aEMfE-8j6db_f3bIASpQUeFib_9nucLvQ0pUAnIbKKTXrLAr_RwACgYKAboSARYSFQHGX2Mi0fwTmOTp_3Hr1XANoHnISBoVAUF8yKo4jm45c4UWfobp-p7C9RhO0076 |
| __Secure-3PAPISID | IW78Kr2rH9_BX2sN/AQRPgaOGX02m07WCk |
| NID | 524=PW9udIg6pY7WpnMb7vvVvepLbfqStJj5li06xLo5h_697Om3-87O_yiKUixzqrjN4UOO88Y-KIISfEWyTw0HrcskU2fjDGaC9w4kAAgBqZa2Os5HOXVfd55qlPSaeL1JF96E-v2xElocbNVNxmAzC5hfu9IyobJgIrYwTbHok5bux4CfCaiXITM4HPUelisb56Q62MYE0dalv8Gu1JaF4Nsuzo7yxcDPAhzgBWz-dbkZYYhLk3xPkZLwO6TMICt1To8Yk5xORnMirR0aRxMhpPA3C6mDFphkaVBcSRkx0kSwTxvx8CHinp97YNd6cBzMf-eT1-aMbFhsZEN1cniGO73S3iB1ITq-mnmijvoXj1WX2ISSXSg |
| __Secure-3PSIDTS | sidts-CjEB5H03P-9J1tiBmMLZT2nFzIDGeqXXCa0XM25eQAKEsmQcJvo8WkO-OIUTBDLcNzAMEAA |
| __Secure-3PSIDCC | AKEyXzW3WQjj_6H29AT5NVpoXeb-ul06-Ok44Wrlep8intpa2VGPZWVEpOYvc_Prm0l0J9x0f5Y |

77.     Below is an example of the data—including cookie data—that is sent to Google after the user rejects cookies on the Mastro's Website:

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| | |
|---|---|
| sct | 1 |
| seg | 1 |
| sid | 1748320152 |
| sr | 1920x1080 |
| tag_exp | 101509157~103116026~103130498~103130500~103200004~103233427~103252644~103252646~104481633~104481635 |
| tfd | 388 |
| tid | G-X8ELZZW4E9 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;136.0.7103.114\|Google%20Chrome;136.0.7103.114\|Not.A%2FBrand;99.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

- 67 -

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| | |
|---|---|
| accept | */* |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| content-length | 0 |
| cookie | __Secure-3PSID=g.a000xQiz-rahOehKPPAagg9aEMfE-8j6db_f3bIASpQUeFib_9nucLvQ0pUAnIbKKTXrLAr_RwACgYKAboSARYSFQHGX2Mi0fwTmOTp_3Hr1XANoHnISBoVAUF8yKo4jm45c4UWfobp-p7C9RhO0076; __Secure-3PAPISID=IW78Kr2rH9_BX2sN/AQRPgaOGX02m07WCk; NID=524=PW9udIg6pY7WpnMb7vvVvepLbfqStJj5li06xLo5h_697Om3-87O_yiKUixzqrjN4UOO88Y-KIISfEWyTw0HrcskU2fjDGaC9w4kAAgBqZa2Os5HOXVfd55qlPSaeL1JF96E-v2xEIocbNVNxmAzC5hfu9IyobJgIrYwTbHok5bux4CfCaiXITM4HPUelisb56Q62MYE0dalv8Gu1JaF4Nsuzo7yxcDPAhzgBWz-dbkZYYhLk3xPkZLwO6TMICt1To8Yk5xORnMirR0aRxMhpPA3C6mDFphkaVBcSRkx0kSwTxvx8CHinp97YNd6cBzMf-eT1-aMbFhsZEN1cniGO73S3iB1lTq-mnmijvoXj1WX2ISSXSg; __Secure-3PSIDTS=sidts-CjEB5H03PzeicJxt8RXxxgCnSi1vq0xF7ojjchRH1waRJYcaU9KgkACQ4pW1yl4dazc5EAA; __Secure-3PSIDCC=AKEyXzVKtBLqAXU0QnSfKjAV7ETNm-0sYcJsJMI0bJKTQoJeeEm-f3AvUpvFpGlDVQS8MhI8S9g |
| dnt | 1 |
| origin | https://www.mastrosrestaurants.com |
| priority | u=1, i |
| referer | https://www.mastrosrestaurants.com/ |
| sec-ch-ua | "Chromium";v="136", "Google Chrome";v="136", "Not.A/Brand";v="99" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/537.36 |
| x-client-data | CJe2yQEIo7bJAQipncoBCPvsygEIlKHLAQiSo8sBCIagzQEI3e7OAQ== |
| Host | analytics.google.com |

CLASS ACTION COMPLAINT

78.     Below is an example of the data—including cookie data—that is sent to Google after the user rejects cookies on the McCormick Website:



CLASS ACTION COMPLAINT

| sr | 1920x1080 |
| tag_exp | 101509157~103116026~103130495~103130497~103200004~103233427~103252644~103252646~104481633~104481635 |
| tfd | 430 |
| tid | G-RW3BK68HCE |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;136.0.7103.114\|Google%20Chrome;136.0.7103.114\|Not.A%2FBrand;99.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| | |
|---|---|
| cookie | __Secure-3PSID=g.a000xQiz-rahOehKPPAagg9aEMfE-8j6db_f3bIASpQUeFib_9nucLvQ0pUAnIbKKTXrLAr_RwACgYKAboSARYSFQHGX2Mi0fwTmOTp_3Hr1XANoHnISBoVAUF8yKo4jm45c4UWfobp-p7C9RhO0076;<br>__Secure-3PAPISID=IW78Kr2rH9_BX2sN/AQRPgaOGX02m07WCk;<br>NID=524=emRQUg4dGFssuwJEt8rwVNpyMqfv2GTunLsPgxSnxaxDGSv8uYXByi47k-lpi-3ushp9MtIR8YDjPYvG0HkswN71cxBqVeqwa3oMyMrwX020dKEvkSL_AAo3VpSzrV49kFkk8SXOnAmO22ptx35ECwOepr0OzKuwAOQ9NMBrMrJHp_q6Te0k6adyLSzcCbg66pyKTOr_cyTjmfhosTiZ64trDvHDoAVGZxFQx3PY8mbJeQlof_T_6KP_JjxHRmFAI07vp58bdG7gOeo7gFm31Kgj2votB5d6MWYsh5M3uvI4r565oKDvhuNe0VD2HEEqkrrIRxa6iu5YsXQs_mQFCuRu7jgiZUM_fb6icZlp_SVVF6BA8rY; __Secure-3PSIDTS=sidts-CjEB5H03PyDYSoggigtZHFUApj7qosE30FaP_s9ZYAOJxIAEuwXE8fqLK5IQChLTIIcuEAA;<br>__Secure-3PSIDCC=AKEyXzU3yTIxY-Rub7Jq4gxo_yL07DHBdKejTdkiUBXoqrv0SwKGwdKuJXQJ3_fM2VLX7ALv1_k |
| dnt | 1 |
| origin | https://www.mccormickandschmicks.com |
| priority | u=1, i |
| referer | https://www.mccormickandschmicks.com/ |
| sec-ch-ua | "Chromium";v="136", "Google Chrome";v="136", "Not.A/Brand";v="99" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | no-cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/537.36 |
| x-client-data | CJe2yQEIo7bJAQipncoBCPvsygEIIKHLAQiSo8sBCIagzQEI3e7OAQ== |
| Host | analytics.google.com |

CLASS ACTION COMPLAINT

79.    Below is an example of the data—including cookie data—that is sent to Google after the user rejects cookies on the Morton's Website:

CLASS ACTION COMPLAINT

- 76 -

sct          1
seg          1
sid          1748380856
sr           1920x1080
tag_exp      101509157~103116026~103130495~103130497~103200004~1
             03233427~103252644~103252646~104481633~104481635

tfd          349
tid          G-KGPQM8K9DK
uaa          arm
uab          64
uafvl        Chromium;136.0.7103.114|Google%20Chrome;136.0.7103.114|
             Not.A%2FBrand;99.0.0.0
uam
uamb         0
uap          macOS
uapv         13.5.1
uaw          0
ul           en-us
v            2

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

cookie        __Secure-3PSID=g.a000xQiz-
rahOehKPPAagg9aEMfE-8j6db_f3bIASpQUeFib_9nucL
vQ0pUAnIbKKTXrLAr_RwACgYKAboSARYSFQHGX2Mi0
fwTmOTp_3Hr1XANoHnISBoVAUF8yKo4jm45c4UWfob
p-p7C9RhO0076;
__Secure-3PAPISID=IW78Kr2rH9_BX2sN/
AQRPgaOGX02m07WCk;
NID=524=AumWinjbETK9n_DSGWUb48gtgtuZwQXvIsO
Ep3js-4wLm9O3h415mF2mqZ1LjMCw8HW9tgXqGBhD
1sNtPjzPbXjfrkMuGXIXSm-
xKIBOPoL1vVEl1vZZK1ALKjQsVCW5jYKvKqHRwgTmRO
Z1Z855lDzDhwlE3Ohz0EAZaWnnRj13HmOT71KRcS3t
bFDzXcEV-
ouEo_iRKa0Av4w6ijt7wUUGYw0MI5QexY7M04xZR1zG
BPQaWWP6BLkzv_AQbE7j6wc-
RBNWckNT4L7peK_b1OPhor0rMFo69OCYShxBXa5Sr8
5bQAGs-3LDXMHc5UQUHU4RM0cE0D4G9EljnxcFJvD
2_T560OyM_qJJOlYRRnq5e4WWRI0;
__Secure-3PSIDTS=sidts-
CjEB5H03PzbemUuGyRmEbf_tzMK8pakE_HqC1rUeng
pLIXcWCLZIvtqV5XIgGIFJVIQ4EAA;
__Secure-3PSIDCC=AKEyXzV7YIqrmcFMWruBtp7G6sl
WLc4whdVtiAlY3qSNrgrqERkT7QDReWVMUERzhBG7X
P6rGcc

dnt        1

origin        https://www.mortons.com

priority        u=1, i

referer        https://www.mortons.com/

sec-ch-ua        "Chromium";v="136", "Google Chrome";v="136", "Not.A/Brand";v="99"

sec-ch-ua-mobile        ?0

sec-ch-ua-platform        "macOS"

sec-fetch-dest        empty

sec-fetch-mode        no-cors

sec-fetch-site        cross-site

sec-fetch-storage-access        active

user-agent        Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/136.0.0.0 Safari/537.36

x-client-data        CJe2yQElo7bJAQipncoBCPvsygEllKHLAQiSo8sBClagz QEl3e7OAQ==

Host        analytics.google.com

CLASS ACTION COMPLAINT

80.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

81.     Thus, the Google cookies used on the Websites enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the

CLASS ACTION COMPLAINT

collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[19]

82.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[20] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3.    Additional Third-Party Cookies.**

83.    Defendant also causes third-party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users elect to reject all cookies, other than those strictly necessary for the Websites to function, to and from other domains. For example, the Bubba Gump Website also causes cookie data and other data to be sent to **adentifi.com**, even after users reject non-strictly necessary cookies. That domain is associated with AdTheorent, Inc., a digital advertising company that offers a digital ad-buying platform that enables

---

[19] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[20] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

CLASS ACTION COMPLAINT

businesses to plan, manage, optimize, and measure online advertising campaigns.[21] AdTheorent uses rtb.adentifi.com cookies to collect data users' "as a targeting component" for digital advertising."[22] This data helps AdTheorent personalize ad content and track users across the internet.

84.    The Joe's Crab Shack Website causes cookie data and other data to be sent to a large number of third parties after users reject non-strictly necessary cookies, including Adobe Inc. (demdex.net), PubMatic, Inc., Microsoft Corp. (AppNexus) (adnxs.com), Magnite, Inc. (Rubicon Project), NextRoll, Inc. (Adroll.com), Taboola, Inc., IPONWEB GmbH (BidSwitch), and Index Exchange, Inc. (Casale Media).

85.    The **demdex.net** domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products. Adobe's cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[23] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[24]

86.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and

---

[21] *See* https://adtheorent.com/about).
[22] AdTheorent, Inc. Form 10-K (filed March 12, 2024).
[23] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).
[24] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

CLASS ACTION COMPLAINT

demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[25]

87.    The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[26] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[27] PubMatic uses this data to personalize advertising content and track users across the internet.[28]

88.    The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[29] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[30] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[31] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[32] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed

---

[25] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).
[26] *See* www.metrixlab.com.
[27] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.
[28] *Id*.
[29] https://cookiepedia.co.uk/host/adnxs.com.
[30] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.
[31] *Id*.; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.
[32] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

CLASS ACTION COMPLAINT

Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[33]

89.     The **rubiconproject.com** domain is associated with the Rubicon Project, an advertising exchange platform owned by Magnite, Inc.[34] Rubicon Project operates as a Supply-Side Platform (SSP), enabling website publishers to sell their advertising inventory through real-time bidding auctions. Its cookies are used to assign unique identifiers to users, collect data on their browsing behavior (including IP address, location, and websites visited), and facilitate the exchange of this user data with various ad services.[35] This process, known as cookie syncing, allows advertisers to identify and bid on ad impressions to target specific users across the web, forming a foundational component of the programmatic advertising ecosystem.[36]

90.     The **adroll.com** domain is associated with AdRoll, a digital advertising platform owned by NextRoll, Inc.[37] AdRoll uses cookies to perform retargeting, a practice that involves tracking users who have previously visited a client's website and serving them personalized advertisements on other websites across the internet.[38] These cookies collect data on user browsing activity, website interactions, and cross-device behavior to build user profiles for interest-based advertising campaigns.[39] AdRoll's technology, through cookies such as_adroll and _adroll_shared, assigns unique identifiers to users to facilitate this tracking and ad delivery across multiple platforms and devices, enabling a persistent view of a user's activity regardless of whether they are on a desktop or mobile device.[40]

[33] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.
[34] *See* Platform Cookie Policy - Magnite, accessed September 26, 2025, https://www.magnite.com/legal/platform-cookie-policy/.
[35] *See id.*; *See also* User Choice Portal | Manage Your Privacy Preferences with Magnite, accessed September 26, 2025, https://www.magnite.com/legal/user-choice-portal/.
[36] *See id*.
[37] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025, https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options
[38] *See* Adroll - What Are Cookies? accessed September 26, 2025, https://www.adroll.com/third-party-cookies/what-are-cookies.
[39] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025, https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options.
[40] *See id*.

CLASS ACTION COMPLAINT

91.    This **taboola.com** domain is associated with Taboola, Inc., "one of the world's leading performance advertising platforms for the open web. Through our exclusive partnerships with many of the world's top websites, we help advertisers engage with over 600 million unique daily active users."[41] "Taboola's platform is powered by Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time." [42] Taboola's technology learns user engagement patterns by analyzing data it collects using cookies about user "reading preferences, browsing history, device, location, time of day and more..."[43]

92.    Taboola cookies enable it to obtain and store at least the following user data: user identifiers, browsing history, visit history, website interactions, user input data (such as email addresses), demographic information (such as gender and age), interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers (i.e., "cookie IDs"), and/or geolocation data. [44] This data allows Defendant to target its advertising campaigns to users based on user "location, time, browser type, connection type, audience segments, and more."[45]

93.    Taboola explains in its Privacy Policy the user data it receives from cookies installed on its customers' (such as Defendant) websites and how it uses (and monetizes) that data to create audience segments as follows:

> We use User Information for the following purposes: … **Offering our Customers data segments that help target content and advertisements for topics, products, and services that may interest you.** A data segment is a grouping of users who share one or more attributes (e.g., travel enthusiasts). We offer a number of data segments, both proprietary and from our data partners, to our Customers so that they may better target Users who are more likely to be interested in their content and advertisements. Taboola does not knowingly create segments that are based upon what we consider to be sensitive information (for example, Personal Data revealing your racial or ethnic origin or your religious affiliations, or Personal Data concerning your sensitive health information, sex

---

[41] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#.
[42] *Id.*
[43] *Id.*
[44] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information); *see also* Taboola Cookie Policy (available at https://www.taboola.com/policies/cookie-policy).
[45] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#; *see also* https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences#.

CLASS ACTION COMPLAINT

life or sexual orientation, or genetic or biometric data). In connection with our Services, our Customers may use these standard health-related segments about non-sensitive conditions such as an inferred interest in health and wellness or over the counter medications. In addition, Taboola offers our Customers standard political-related segments that may indicate general political sentiment, interest in specific political issues, and political party affiliation.[46]

94.     The **bidswitch.net** domain is associated with BidSwitch, a technology platform owned by IPONWEB GmbH that functions as middleware in the programmatic advertising ecosystem.[47] BidSwitch's cookies are not used to directly serve ads to users, but rather to facilitate the service of ads between Supply-Side Platforms (SSPs) and Demand-Side Platforms (DSPs).[48] The cookies store unique user IDs and regulate the synchronization of these IDs across different advertising services.[49] This "cookie syncing" is essential for enabling advertisers on various platforms to recognize a user and participate in real-time bidding auctions for ad space on publisher websites, effectively acting as a central hub for identity matching in the ad-tech industry.[50]

95.     The **casalemedia.com** domain is associated with Casale Media, a digital advertising platform owned by Index Exchange, Inc., that operates as part of an ad exchange network.[51] Casale Media's cookies are used to collect data about users' website visits and online behavior, including the number of visits, time spent on sites, and pages loaded.[52] This information is used to build user profiles for the purpose of delivering targeted advertising.[53] The platform enables advertisers to segment audiences and optimize ad relevance by tracking users across multiple websites within its network, and its cookies can also be used for functions like frequency capping to limit the number of times a user is shown the same advertisement.[54]

96.     These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic

---

[46] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information) (emphasis in original).
[47] *See* https://www.bidswitch.com/
[48] *See* https://www.bidswitch.com/privacy-policy/.
[49] *Id*.
[50] https://clearcode.cc/blog/what-is-bidswitch/.
[51] *See* https://www.indexexchange.com/about/.
[52] *See* https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/.
[53] *Id.*
[54] *Id.*

CLASS ACTION COMPLAINT

information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Third Parties Intercept User Communications While in Transit.**

97.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

98.    First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

99.    Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[55] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[56] This deduplication occurs as the communications are received, before they are stored.

---

[55] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[56] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

- 87 -

CLASS ACTION COMPLAINT

100.    Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

101.    Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

102.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

103.    For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[57]

---

[57] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).

CLASS ACTION COMPLAINT

104.    As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines **before** being stored in the data "Warehouse."

105.    Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[58]

---

[58] *Id.* at 2:05.

CLASS ACTION COMPLAINT

106.    As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

107.    On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[59] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[60] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[61] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[62] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[63]

108.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.    The Signaling and Addressing Information Intercepted by the Third Parties.**

109.    The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications

---

[59] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[60] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[61] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).
[62] *Id.*
[63] *Id.*

CLASS ACTION COMPLAINT

initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiffs' or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

110.    The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

111.    Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and the Websites' users' communications, separate from any underlying user input or message content.

112. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and the Websites' users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.      The Private Communications Collected are Valuable.**

113. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California users' devices without their knowledge or consent as they browse the Websites. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

114. The Private Communications tracked and collected through cookies on the Websites are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular restaurant brands and menu offerings, and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

115. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables

CLASS ACTION COMPLAINT

Defendant to assess trends across its brands and within the broader restaurant market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

116. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[64] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

117. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

118. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

<b><u>PLAINTIFFS' EXPERIENCES</u></b>

**<u>Plaintiff Campos</u>**

119. Plaintiff Campos visited the Bubba Gump Website to seek and obtain information about a Landry's brand restaurant (specifically, Bubba Gump Shrimp Co.), while located in California, on one or more occasions during the last four years.

120. Plaintiff Campos's visits to the Bubba Gump Website were consistent with an ordinary Website user's visits seeking information about Defendant's restaurant brand and menu options. Specifically, Plaintiff Campos is not a consumer advocate, a "tester," or a compliance auditor that visited the Bubba Gump Website to test or evaluate Defendant's privacy practices.

---

[64] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

121.    When Plaintiff Campos visited the Bubba Gump Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Do Not Sell My Personal Information" link. Plaintiff Campos viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Campos also viewed Defendant's additional representation that users could, rather than choose to "Accept Cookies," instead reject all such cookies and the sale of user personal information by following the "Do Not Sell My Personal Information" link.

122.    Plaintiff Campos selected and clicked the "Do Not Sell My Personal Information" link. In doing so, the Bubba Gump Website then presented him with Defendant's "Manage Consent Preferences" window. There, Defendant further represented that users, including Plaintiff, could "choose not to allow certain types of cookies" and could "change our default settings according to your preference[,]" except for "First Party Strictly Necessary Cookies[,]" from which Plaintiff and users could not opt-out.

123.    Plaintiff Campos saw the "Sale of Personal Data" toggle switch on the "Manage Consent Preferences" window found on the Bubba Gump Website and believed adjusting this toggle switch would allow him to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of those cookies that "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data).

124.    In adjusting the "Sale of Personal Data" toggle switch, Plaintiff Campos gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Campos specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics

CLASS ACTION COMPLAINT

partners[,]" and sell user personal data. In reliance on these representations and promises, only then did Plaintiff Campos continue browsing the Bubba Gump Website.

125. Even before the popup cookie consent banner or "Manage Consent Preferences" window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for traffic analysis and information sharing and sales, to be placed on Plaintiff Campos's device and/or transmitted to the Third Parties along with user data, without his knowledge. Accordingly, the popup cookie consent banner's and "Manage Consent Preferences" window's representations to Plaintiff Campos that he could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies (including Performance and Targeting cookies) while he browsed the Bubba Gump Website was false. Contrary to what Defendant made Plaintiff Campos believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

126. Then, as Plaintiff Campos continued to browse the Bubba Gump Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Campos's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data—including those involved in analyzing performance and traffic, and sharing information about users' use of the Bubba Gump Website with the Third Parties—on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Campos's Private Communications as he browsed the Bubba Gump Website.

127. Defendant's representations that consumers could reject all cookies except "First Party Strictly Necessary Cookies" and opt-out of the sale of personal data while Plaintiff Campos and users browsed the Website, or at least those involved in traffic analysis and information sharing and sales, were untrue. Had Plaintiff Campos known this fact, he would not have used the Bubba Gump Website. Moreover, Plaintiff Campos reviewed the popup cookie consent banner and "Manage Consent Preferences" window prior to using the Bubba Gump Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be

- 95 -

CLASS ACTION COMPLAINT

Case 4:26-cv-04608-ASK   Document 1   Filed 05/15/26   Page 98 of 119

stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Campos would have noticed it and would not have used the Bubba Gump Website or, at a minimum, he would have interacted with the Website differently.

128. Plaintiff Campos continues to desire to browse content featured on the Bubba Gump Website and Defendant's other Websites. Plaintiff Campos would like to browse websites that do not misrepresent that users can reject all non-strictly necessary cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Campos would likely browse the Websites again in the future, but will not do so until then. Plaintiff Campos regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Campos does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-strictly necessary cookies and tracking technologies, he will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Campos is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Corona-Cantu**

129. Plaintiff Corona-Cantu visited the Bubba Gump Website to seek and obtain information about a Landry's brand restaurant (specifically, Bubba Gump Shrimp Co.), while located in California, on one or more occasions during the last four years.

130. Plaintiff Corona-Cantu's visits to the Bubba Gump Website were consistent with an ordinary Website user's visits seeking information about Defendant's restaurant brand and menu options. Specifically, Plaintiff Corona-Cantu is not a consumer advocate, a "tester," or a

CLASS ACTION COMPLAINT

compliance auditor that visited the Bubba Gump Website to test or evaluate Defendant's privacy practices.

131.     When Plaintiff Corona-Cantu visited the Bubba Gump Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Do Not Sell My Personal Information" link. Plaintiff Corona-Cantu viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff Corona-Cantu also viewed Defendant's additional representation that users could, rather than choose to "Accept Cookies," instead reject all such cookies and the sale of user personal information by following the "Do Not Sell My Personal Information" link.

132.     Plaintiff Corona-Cantu selected and clicked the "Do Not Sell My Personal Information" link. In doing so, the Bubba Gump Website then presented her with Defendant's "Manage Consent Preferences" window. There, Defendant further represented that users, including Plaintiff, could "choose not to allow certain types of cookies" and could "change our default settings according to your preference[,]" except for "First Party Strictly Necessary Cookies[,]" from which Plaintiff and users could not opt-out.

133.     Plaintiff Corona-Cantu saw the "Sale of Personal Data" toggle switch on the "Manage Consent Preferences" window found on the Bubba Gump Website and believed adjusting this toggle switch would allow her to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of those cookies that "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data).

134.     In adjusting the "Sale of Personal Data" toggle switch, Plaintiff Corona-Cantu gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Corona-Cantu specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic[,]"

"share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data. In reliance on these representations and promises, only then did Plaintiff Corona-Cantu continue browsing the Bubba Gump Website.

135. Even before the popup cookie consent banner or "Manage Consent Preferences" window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for traffic analysis and information sharing and sales, to be placed on Plaintiff Corona-Cantu's device and/or transmitted to the Third Parties along with user data, without her knowledge. Accordingly, the popup cookie consent banner's and "Manage Consent Preferences" window's representations to Plaintiff Corona-Cantu that she could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while she browsed the Bubba Gump Website was false. Contrary to what Defendant made Plaintiff Corona-Cantu believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

136. Then, as Plaintiff Corona-Cantu continued to browse the Bubba Gump Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Corona-Cantu's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data—including those involved in analyzing performance and traffic, and sharing information about users' use of the Bubba Gump Website with the Third Parties— on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Corona-Cantu's Private Communications as Plaintiff browsed the Bubba Gump Website.

137. Defendant's representations that consumers could reject all cookies except "First Party Strictly Necessary Cookies" and opt-out of the sale of personal data while Plaintiff Corona-Cantu and users browsed the Website, or at least those involved in traffic analysis and information sharing and sales, were untrue. Had Plaintiff Corona-Cantu known this fact, she would not have used the Bubba Gump Website. Moreover, Plaintiff Corona-Cantu reviewed the popup cookie consent banner and "Manage Consent Preferences" window prior to using the

Bubba Gump Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Corona-Cantu would have noticed it and would not have used the Bubba Gump Website or, at a minimum, she would have interacted with the Website differently.

138.    Plaintiff Corona-Cantu continues to desire to browse content featured on the Bubba Gump Website and Defendant's other Websites. Plaintiff Corona-Cantu would like to browse websites that do not misrepresent that users can reject all non-strictly necessary cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Corona-Cantu would likely browse the Websites again in the future, but will not do so until then. Plaintiff Corona-Cantu regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Corona-Cantu does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-strictly necessary cookies and tracking technologies, she will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Corona-Cantu is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

139.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

- 99 -

CLASS ACTION COMPLAINT

**Class**: All persons who browsed any of Defendant's Websites in the State of California after choosing to reject all cookies other than those strictly necessary for the Websites to function.

140. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

141. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

142. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-strictly necessary cookies and tracking technologies on the Websites, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

143. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

144. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited at least one of the Websites, rejected all non-strictly necessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

CLASS ACTION COMPLAINT

145.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

146.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**CAUSES OF ACTION**

**First Cause of Action: Invasion of Privacy**

147.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

- 101 -

CLASS ACTION COMPLAINT

148. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

149. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

150. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could reject all cookies other than those strictly necessary for the Websites to function (including Performance and Targeting cookies) before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner, "Manage Consent Preferences" window, or similar option on the Websites, Plaintiffs and Class members rejected non-strictly necessary cookies and tracking technologies (including Performance and Targeting cookies_ and reasonably expected that their rejection of non-strictly necessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

151. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information,"

- 102 -

CLASS ACTION COMPLAINT

such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

152.    Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

153.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

154.    Defendant's intrusions into Plaintiffs' privacy was also highly offensive to a reasonable person.

155.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and

- 103 -

CLASS ACTION COMPLAINT

preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

156.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

157.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

158.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Second Cause of Action: Intrusion Upon Seclusion

159.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

160.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

161.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of the Websites' users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

162.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Websites' users specifically chose to reject all cookies other than those strictly necessary for the Websites to function.

163.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendant's promise that users could reject all cookies other than those strictly necessary for the Websites to function, as well as state criminal and civil laws designed to protect individual privacy.

164.    Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that the Websites' users could reject all non-strictly necessary cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all non-strictly necessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

165.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

166.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

167.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well

as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

168. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

169. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

170. California Penal Code § 631(a) provides, in pertinent part:

"Any person [i] who by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

171. Defendant is a "person" within the meaning of California Penal Code § 631.

172. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

173. Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were

CLASS ACTION COMPLAINT

third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other.

174. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

175. At all relevant times, the Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

176. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

177. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates a Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

CLASS ACTION COMPLAINT

178. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

179. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject all cookies other than those strictly necessary for the Websites to function.

180. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

181. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

182. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages

CLASS ACTION COMPLAINT

of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

183.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to restaurants and their menu options. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if her and their request to reject non-strictly necessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

184.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

185.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

186.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

- 109 -

CLASS ACTION COMPLAINT

187.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

188.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

189.    At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information) to be transmitted to the Third Parties.

190.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

191.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Websites' use of third-party cookies by choosing to reject all cookies other than those strictly necessary for the Websites to function.

192.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

CLASS ACTION COMPLAINT

193.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

194.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

195.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

196.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could reject all cookies other than those strictly necessary for the Websites to function.

197.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users rejected all cookies other than those strictly necessary for the Websites to function. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject all cookies other than those strictly necessary for the Websites to function.

198.    Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

199.    By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

200.    Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject all non-strictly necessary cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

CLASS ACTION COMPLAINT

201. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

202. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

203. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See, e.g.*, California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

204. On information and belief, Defendant either knew its representations regarding users' ability to reject non-strictly necessary and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations

- 112 -

CLASS ACTION COMPLAINT

carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

205. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

206. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

207. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

208. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

209. Defendant's representation that consumers could reject non-strictly necessary cookies (including those cookies that "analyze performance and traffic[,]" "share information about your use of our site with our social media, advertising and analytics partners[,]" and sell user personal data) if they adjusted the available toggle switch or options on the Websites was

CLASS ACTION COMPLAINT

untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner, "Manage Consent Preferences" window, and similar options prior to their interactions with the Websites. Had Defendant disclosed that it caused third-party non-strictly necessary cookies to be stored on Websites' visitors' devices that are related to traffic analysis and/or the sales or sharing of information with third parties even after they choose to reject all such non-strictly necessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

210.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject non-strictly necessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

211.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

212.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

213.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

214.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

CLASS ACTION COMPLAINT

215.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

216.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject all cookies other than those strictly necessary for the Websites to function, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

217.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

218.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

219.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at her and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

220.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

221.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

222.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position she and they occupied prior to having their Private Communications tracked and collected by the Third Parties.

CLASS ACTION COMPLAINT

223.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: May 15, 2026

CLASS ACTION COMPLAINT

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT